37 C.C.P.A.(Patents)

MILLER v. NEMMER et al.

Patent Appeals No. 5627.

United States Court of Customs and Patent Appeals.

Argued Nov. 7, 1949.

Decided Feb. 2, 1950.

H. F. McNenny and D. W. Farrington, Cleveland, Ohio (Martin E. Hogan, Jr., Baltimore, Md., Watts T. Estabrook, Washington, D. C., F. O. Richey, and Richey & Watts, Cleveland, Ohio, of counsel), for appellant.

Alexander F. Baillio, Detroit, Mich., and John G. Sbarbaro, Washington, D. C., for appellees.

Before GARRETT, Chief Judge, and JACKSON O'CONNELL, and JOHNSON, Associate Judges.

GARRETT, Chief Judge.

Appellant here seeks reversal of the decision of the Board of Interference Examiners of the United States Patent Office awarding priority to appellees, as joint inventors, of a valve structure defined in a

single count reading: "In a valve, a body which has in it a recess, a wall which subdivides the recess into an inlet chamber and an outlet chamber, a port through which fluid enters the inlet chamber, a port through which fluid leaves the outlet chamber, a member disposed in one of the chambers and mounted so that it can rotate within it, means which defines two paths by which fluid may pass from the inlet chamber to the outlet chamber including two ports which open into the side of the chamber in which the member is disposed and a port which opens into the other chamber, and means by which the member may be rotated to and from a position in which a portion thereof closes either and leaves open the other of the second specified ports, including a bimetal thermostat disposed within the outlet chamber between the ports through which fluid enters and leaves it."

The board described the subject matter as follows: "The subject matter in issue pertains to an improvement in valve mechanism for controlling the flow of oil for the purpose of regulating the temperature of the same in an internal combustion engine. The valve mechanism automatically, by means of a thermostat, directs the flow of the oil being circulated in the lubricating system through the engine proper, a relatively unresistive path, when the oil is cold; through a partial cooler as the oil becomes warm; and finally through the core of a heat exchanging device as the oil becomes hot. The need for a device of this nature is greatest in airplanes although it is not limited to any particular type of engine."

The board stated the following relating to the history of the case: "As originally instituted this interference contained two counts but count 1 was held to be unpatentable by the primary examiner * * * on a motion to dissolve by Nemmer and O'Brien. In the same decision proposed counts F and BB were held to be patentable and proposed count BB was held to be applicable to the disclosures of both parties. It was held in the decision rendered November 29, 1945 * * * that the disclosures of both parties supported proposed count F. Nemmer et al. did not make either proposed count F or the proposed count BB, as a result, the interference is continued on only one count, original count 2."

The interference is between applications. The application of Nemmer et al., Serial No. 396,830 (assigned to General Motors Corporation) was filed June 6, 1941; that of Miller, Serial No. 560,474 (in which, as we understand it, the Glenn L. Martin Company has an interest as Miller's employer) was filed October 26, 1944, as a division of a prior application, Serial No. 414,005, filed October 7, 1941.

■ Miller, as the junior party, had the burden of establishing priority by a preponderance of the evidence.

The board's statement of the issue, as the case was presented to it, reads: "At final hearing it was agreed by each of the parties that each of the parties relied upon the same reduction to practice, in September 1940, as their reduction to practice. The primary question to be determined then, is, who was the first to conceive the invention? Under the existing circumstances the question of diligence cannot arise (McParland v. Beall, 231 O.G. 605; 1916 C.D. 231; 45 App.D.C. [162]; Whittier v. Borchardt, 588 O.G. 6; 1946 C.D. 361; 33 C.C.P.A. [Patents] 1023; 154 F.2d 522; 69 U.S.P.Q. 382)."

The following "background" of the case is taken from the decision of the board. (The Harrison Radiator Division referred to is understood to be one of the divisions, or units, of General Motors.)

"Harrison Radiator Division (hereinafter referred to as Harrison) developed a new oil cooler designed to be used with the standard control valves then on the market and were interested in finding a market for their cooler. With this end in view chief engineer Holmes of Harrison called on the Glenn L. Martin Company (hereinafter referred to as Martin) on June 12, 1940 to interest Martin in their new cooler. At this time Holmes met Ebel, chief engineer, and Miller, power plant engineer, of Martin, and was informed by Miller that Martin was accustomed and preferred to obtain the valves used with its oil coolers

from the same source as the coolers. Although Harrison did manufacture various types of control valves they did not manufacture at this time a valve assembly designed especially for their new oil cooler.

"Martin was building some light bombers for the British Government and was anxious to have the Harrison oil coolers, which appeared much superior to previous coolers, ready to install when the bombers were sufficiently completed. At Miller's telephonic request Holmes next saw Miller on July 9, 1940 at the Martin plant. Apparently Harrison was not desirous of supplying a control valve with their cooler for Miller told Holmes that they felt very strongly about the matter of procuring the oil cooler and a suitable control valve as a unit. Miller drew a sketch (Miller Exh. 7) to disclose to Holmes the functions of a valve which he (Miller) believed to be desirable for an oil cooler installation. At the close of the discussion Holmes stated that he thought he could deliver an oil cooler and valve for test within thirty days.

"Holmes returned to the Harrison plant with the sketch and had Nemmer (now deceased) and O'Brien assigned to him to design and build a valve arrangement which would perform the functions indicated on the sketch. *Without further instruction* Nemmer and O'Brien designed and built *a rotary valve construction having a bimetallic thermostat* (Miller Exh. 12) which performed the functions intended. The valve shown in exhibit 7 is a *reciprocating valve operated by means of a sylphon.* Harrison built several of the Nemmer and O'Brien valves some of which were tested at the Harrison plant. One valve assembly was mounted on an oil cooler which Holmes took to Martin on August 13, 1940 where it was flight tested. Basically the valve operated as intended but as might be expected several minor corrections had to be made but these in no way modified the principle of the original design. The improved valve structure was flight tested in September, 1940 and proved to be very satisfactory." (Italics ours.)

The board awarded Nemmer et al. the date of July 31, 1940, for conception of the invention defined in the count in issue, and no error is alleged by appellant as to that holding. As to Miller, it was held that he had not established disclosure of a "structure which shows every essential element of the invention as defined in the count prior to the date" awarded Nemmer et al.

The board designated two structural features specified in the count which in its original decision it found had not been disclosed by Miller prior to the conception date awarded Nemmer et al., viz.: (1) "a member disposed in one of the chambers and mounted so that it can rotate within it," and (2) "a bimetal thermostat disposed within the outlet chamber."

Those two features were found not to be shown in the sketch, Miller Exhibit 7.

The board found that in Exhibit 7 Miller disclosed an *axial sliding member* instead of the *rotating member* of Nemmer et al. and a *sylphon* instead of a *bimetal thermostat.*

Certain other sketches introduced in evidence as Miller Exhibits Nos. 16, 17, 18, 19, and 20 are mentioned in the brief for Miller before us. Three of them—17, 18, and 19—were discussed by the board in a second decision denying Miller's petition for rehearing, the board saying: "At final hearing exhibit 7 received the 'lion's share' of attention and the board was misled thereby into thinking that this exhibit was relied upon as Miller's conception. Miller does refer in his brief to his exhibits 17, 18 and 19 as showing his complete conception, however, these exhibits show identical valve structures which are substantially the same as shown in his exhibit 7 but showing a bimetallic thermostat in exhibits 17 and 18 and a Sylphon in exhibit 19."

There is no reference in the reasons of appeal to us to any sketch other than Miller's Exhibit 7, and, whatever may be the situation under the board's finding in its second decision that Miller Exhibit 17 and 18 show a bimetallic thermostat (in just what relation is not stated), there is no contention on Miller's behalf that, prior to the "date awarded Nemmer et al. for

conception." he disclosed "a member disposed in one of the chambers and mounted so that it can *rotate* within it." (Italics ours.)

It *is vigorously* contended on Miller's behalf that he "disclosed the principle and general plan of the invention" to Holmes who turned the disclosure over to Nemmer and O'Brien, fellow employees with Holmes in the Harrison Radiator Division, and that the structural features not disclosed by Miller but supplied by Nemmer et al. were "ancillary additions or modifications" (incorporated by the latter in making the valve) which are part of the invention, and that they belong to Miller. The contention is really made that the transaction between Miller and Holmes amounted to an employment of the Harrison Radiator Division to reduce Miller's invention to practice.

We quote the following from the Miller brief: "The question presented by this appeal is whether the Board erred in refusing to follow the established rule of law that ancillary additions or modifications incorporated in an invention by a mechanic in reducing the invention to practice belong to, and are a part of the invention of, the inventor who disclosed the principle and general plan of the invention to the mechanic and employed him to reduce it to practice."

Before the board it was, and before us it is, argued on behalf of Miller that decision of the controversy is controlled by the "doctrine" stated in the decision of the Supreme Court of the United States in the case of Agawam Woolen Company v. Jordan, 7 Wall. 583, 74 U.S. 583, 19 L.Ed. 177, decided in December 1868. In the appeal to us it is alleged that the board erred "In not ruling that Miller is entitled to priority under the rule of law stated" in that case.

That case was a proceeding in equity involving infringement.

We deduce from the decision that on December 5, 1826, letters patent were issued to one John Goulding of Massachusetts for "a certain machine for manufacturing wool and other fibrous material," which expired December 5, 1849. There appears to have been a reissue on July 29, 1836, "for the residue of the original term" of fourteen years, as the law then provided.

For reasons not very clearly stated in the decision and which are of no importance here, the Congress of the United States on May 30, 1862, passed a special act, 12 Stat. 904, authorizing a "renewal and extension" of the patent, and on August 30, 1862, the commissioner exercised the authority as conferred.

At some period prior to June 28, 1864, a party by the name of Jordan became "possessed" of a full title to the patent by assignments, and, as assignee, surrendered the letters patent and on that date (June 28, 1864) the commissioner reissued to him the original patent, as extended by authority of the special act of Congress.

Thereafter Jordan filed, as a proceeding in equity, a bill of complaint alleging infringement by Agawam Company, which was sustained by the United States Circuit Court of Massachusetts from whose decree the appeal was taken to the Supreme Court.

In its answer, Agawam Company set forth numerous grounds of defense. The only one which is of any possible pertinence here is stated as follows in the opinion of the Supreme Court: "1. That the combinations set forth in the several claims of the patent were first invented by one Edward Winslow, and that neither of them was original with the assignor [Goulding] of the complainant [Jordan]."

It is noted that the litigation occurred almost forty years after the original grant of the patent to Goulding.

The following appears in the body of the opinion of the Supreme Court as findings of fact:

"The evidence shows that the original patentee was born in 1793, and that he commenced working on machinery in his youth, while he was with his father, and that, as early as the year 1812, he went into the employment of certain machinists, residing at Worcester, Massachusetts, who were engaged in constructing machinery for the manufacture of wool and cotton. While in their employment, he began experiments in woollen machinery. Those

experiments were directed to the object of improving the billy, for the purpose of drawing out the carriage more accurately, and thereby making better work. Several years were spent in that business, but, in 1820, he went to Halifax, in that State, and, while there, he made numerous experiments to get rid of the billy entirely, and to dispense with short rolls, and substitute long rolls in their place. He remained there three years, and, during that time, he was constantly engaged in experiments to accomplish those objects. In the spring of 1823 he moved to Dedham, in the same State, and there hired a mill, and engaged in the manufacture of broadcloth, and also carried on the machine business, and the witness also states that he then prosecuted his experiments on a large scale.

"Cans were used as a receptacle for the rovings, delivered from the doffers, before the drawing-off and winding apparatus, described in the patent, was invented. Rovings, before that invention, were spun from cans, instead of being wound upon, and spun from, spools or bobbins. Considerable importance is attached to the new method, as it was largely by that means that the use of the endless roving was made practical, and that the difficulty produced by the kinking of the roving, incident to the use of the cans, was overcome."

In the statement of the case, preceding the formal opinion of the Court, (made in conformity with the custom generally prevailing in the Supreme Court at the time the decision was rendered it is said:

"Taken all together, this part of the case, on favorable assumption for the defendant, seemed somewhat thus: After Goulding came to Dedham, and had been experimenting there for a considerable time, one Edward Winslow, a blacksmith by trade, but if the testimony in his favor was to be believed, an ingenious man, came into his service. Winslow professed no skill out of his business, but made himself useful generally in whatever Goulding found it most convenient to set him to do; working generally in iron. He had no charge of Goulding's machine shop, but was not unfrequently in it. Goulding himself directed all that was done about machinery, whether as to making or as to altering it. In 1824, Winslow having been to a neighbor's factory, where certain devices, meant to produce long or endless rolls, and to serve as receptacles for the rovings, had been introduced on machinery for spinning yarn, Goulding, who had now nearly completed his improvement, and while he was diligently prosecuting his experiments, asked him what he thought of them. Winslow replied that the principle of them was good, but that the agencies employed were bad, and suggested certain substitutes (a spool and drum) for them. 'You don't know anything,' was Goulding's first reply. However, upon seeing an experiment, apparently at first successful, made at his own mill, on the basis of Winslow's idea, he exclaimed, 'Winslow, you have got it. I will give you $2500 and half of what we can make.' But the experiment broke down in the process of exhibiting it. Goulding then exclaiming, 'Your plan isn't worth a cent. I would not give a fig for it,' left the mill. Upon further conversation and consideration, Goulding saw merit in Winslow's suggestions, and having made them practicable by an addition of his own (the 'traverser,' whose effect was to wind the roving evenly on the spool), he adopted them (instead of cans, the far less convenient agency previously used) as two items of his far larger improvement. As it turned out in the result they proved useful.

"It appeared, however, and was so assumed by this court, after a very minute statement in the terms of art, of many details of the matter, that it was only as an *auxiliary* part of Goulding's invention that they were of value, and that they did not make either the entire invention or any one of its separate combinations." (Italics quoted.)

In the body of the opinion, 74 Wall. 605, 74 U.S. 605, 19 L.Ed. 177, it is said: "Theory of the respondents [Agawam Company] is, that the new method of accomplishing that function [that is, the use of spools and drums instead of cans in the production of long or endless rolls]

was invented by Edward Winslow, but their witness, John D. Cooper, only testifies that he made or suggested the spool and drum, which are not the only elements of that apparatus. Unaccompanied by the traverser, they would, perhaps, be better than the cans, but it is clear that the apparatus would be *incomplete without that device,* as it is by that means that the bobbins are evenly wound with the roving." (Italics supplied.)

After discussing the testimony relative to this phase of the case the Court continued:

"* * * Taken in the strongest view for the respondents, the testimony merely shows that Winslow, or the witness Cooper, or both together, after the originator of the plan had nearly completed his great and valuable improvement, and while he was still prosecuting his experiments with the utmost diligence, suggested the spool and drum as substitutes for the cans, and that Winslow actually made those devices, and, with the aid of witness, put them into one of the machines *as an experiment.* When their employer first examined the arrangement, rude as it was, he expressed great satisfaction with it, but upon seeing it tried he pronounced it of no value. Neither of those opinions, however, turned out to be quite correct, as, upon, further trial, when better adjusted, and by *adding the traverser,* so that the contrivance would wind the roving evenly on the spool, it proved to be a useful auxiliary part of the invention. (Italics supplied.)

"Valuable though it was and is, as aiding in the accomplishment of the desired result, it is nevertheless a great error to regard it as the invention described in the subsequent patent, or *as such a material part of the same* that it confers any right upon the party who made the suggestion to claim to be the inventor, or a joint inventor, of the improvement, or to suppose that the proof of what was done by that party can constitute any defence, as against the owner of the patent, to the charge of infringement." (Italics supplied.)

The brief for Miller quotes the following somewhat abstract observations of the Court which appear, 74 Wall. on pages 602

and 603, 19 L.Ed. 177, of the opinion preceding the last above quoted matter:

"No one is entitled to a patent for that which he did not invent unless he can show a legal title to the same from the inventor or by operation of law; but where a person has discovered an improved principle in a machine, manufacture, or composition of matter, and employs other persons to assist him in carrying out that principle, and they, in the course of experiments arising from that employment, make valuable discoveries ancillary to the plan and preconceived design of the employer, such suggested improvements are in general to be regarded as the property of the party who discovered the original improved principle, and may be embodied in his patent as a part of his invention.

* * * * * *

"Persons employed, as much as employers, are entitled to their own independent inventions, but where the employer has conceived the plan of an invention and is engaged in experiments to perfect it, no suggestions from an employee, not amounting to a new method or arrangement, which, in itself is a complete invention, is sufficient to deprive the employer of the exclusive property in the perfected improvement.

* * * * * *

"Guided by these well-established principles, the first inquiry is, what was actually done by the person who, as alleged by the respondents, was the real inventor of what is described in the reissued letters patent? They do not pretend that he invented or even suggested the entire invention, nor all of the several elements embraced in any one of the separate combinations, as expressed in the claims of the patent; and if they did, it could not for a moment be sustained, as it finds no support whatever in the evidence. None of the devices described in the specifications are new, but the claims of the patent are for the several combinations of the described elements arranged in the manner set forth, and for the purpose of working out the described results.

"Regarded in that light, *it is clear that the concession that the person named did not invent nor suggest the entire invention,*

*nor any one of the separate combinations, is equivalent to an abandonment of the proposition under consideration, as it is clear to a demonstration that nothing short of that averment can be a valid defence."* (Italics used in the brief.)

We have deemed it proper to set forth the facts, as found by the Court in that case, in greater detail than is given in the decision of the board or in either of the briefs before us, because of the great emphasis which is placed upon it on behalf of appellant here, and because, as the board intimated, the decision probably is more favorable to appellant here than any of the other cited decisions.

Indeed, we find no other decision cited on behalf of appellant which, in our opinion, lends support to his cause, and, from a careful study of the facts of that case —facts found by the Supreme Court itself —it is our conclusion that the decision is in nowise controlling here.

It is clear that Winslow was an *employee of Goulding* and he *"professed no skill out of his business, but made himself useful generally in whatever Goulding found it most convenient to set him to do;* working generally in iron"; that Goulding *"himself directed all that was done about machinery, whether as to making or altering it";* that the "spool and drum" features which Winslow suggested were finally made practicable and the apparatus completed by a "traverser whose effect was to wind the roving evenly on the spool," which traverser was supplied by Goulding himself, Winslow having nothing to do with it. (Italics ours.)

It seems obvious to us that there is no substantial analogy between the facts of that case and the facts of the instant case.

Notwithstanding the implication on behalf of Miller that Nemmer et al. occupied the status of a "mechanic" employed by him (Miller) "to reduce it [his invention] to practice," the fact remains that there was no privity whatever between him and Nemmer et al. So far as the record shows, he never saw them, never made a suggestion to them, nor did they ever see or make suggestions to Miller.

It is true, of course, that a disclosure of a device was made to Holmes, a fellow employee with Nemmer et al. of the Harrison Radiator Division, in the drawing, Miller Exhibit 7, and that Holmes disclosed that drawing to Nemmer et al., but that was not a disclosure of the device which Nemmer et al. made and which became the device supplied by Harrison and used in the Martin airplanes.

Incidentally, it may be said that there is a conflict in the testimony as to whether Martin or Holmes actually made the drawing, or at least, parts of the drawing, Miller Exhibit 7, but this is of no importance. Whoever drew it, we assume that it was drawn to Martin's disclosure. The important point is that Nemmer et al. did not follow that drawing, but made something different, and that "something," in our opinion, was more than an "ancillary addition to or modification of Miller's disclosure." There was, of course, no "addition" to the Miller disclosure, nor do we think there was a modification of it, such as fairly may be said was present in the "spool and drum" suggestion of Winslow in the Agawam Company v. Jordan case, supra.

We do not regard tenable the claim on behalf of Miller to the effect that, under the proceedings had, the Harrison Radiator Division became an employee of Martin, for reducing Miller's disclosure to practice. From our study of the testimony, we conclude that the transaction evidences, as is contended in the brief for Nemmer et al., no relationship between the parties other than that of "customer and supplier."

In the reasons of appeal before us there are assignments of error relating to an alleged disclaimer on the part of Nemmer et al. growing out of their failure to make a proposed count (the "Count F" referred to in the third paragraph quoted from the decision of the board in the early portion of this opinion), which, as stated by the board, is a generic count, while the count here involved is a species count. Those assignments are not argued in the brief for Miller before us, and, obviously, are not relied upon. So, we need not discuss them.

The record in this case is somewhat complex and contains much matter which, however relevant it may have been to the issues as they were being presented below, has no particular relevancy as the matter has been presented before us. This is not said by way of criticism but as a preliminary to stating that seemingly every possible phase of the controversy has received careful and thorough consideration by the tribunals of the Patent Office. The Primary Examiner rendered at least five decisions upon the phases arising before him, and the Board of Interference Examiners rendered two decisions on the merits—the latter upon a petition for reconsideration. Appellant, as was his right, has been quite pertinacious in his contentions—indeed, we think he has insisted upon the court adopting somewhat strained constructions, particularly with reference to the relationship between the contesting parties, and possibly with regard to the structural features disclosed.

We are not convinced of error on the part of the Board of Interference Examiners [1] and its decision is affirmed.

Affirmed.

By reason of illness, HATFIELD, Judge, was not present at the argument of this case and did not participate in the decision.

[1] Throughout the record in this case the board is frequently referred to as the "Board of Patent Interferences." We have used the statutory designation— "Board of Interference Examiners."